Filed 11/5/15  In re A.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re A.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E063291 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J243366 & J247895) |
| v. | OPINION |
| T.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant T.P. (Mother) appeals from the juvenile court's order terminating her parental rights to her four-year-old son A.P. and almost three-year-old daughter I.P. (Welf. & Inst. Code, § 366.26.)[1] On appeal, Mother contends the juvenile court misapplied the law in applying the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) to termination of parental rights. She also claims substantial evidence does not support the conclusion that the exception did not apply. We reject these contentions and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Bernardino County Department of Children and Family Services (CFS) on March 15, 2012, after an immediate response referral was received concerning the condition of Mother's home and the welfare of Mother's two sons, then two-year-old B.O.[2] and nine-month-old A.P. Upon investigation, CFS found the home to be in deplorable condition with very little food. The owners of the home were Mother's father and stepmother. B.O. was very dirty and appeared to be wearing the same clothing as observed two days previously. A.P. was not at the home and had been taken by a paternal aunt for medical care. Mother was arrested

_____

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] B.O. is not a party to this appeal.

2

as a result of the welfare check, and B.O. was taken into protective custody.[3] A warrant for A.P.'s apprehension was issued.

Mother reported that she and J.G. had been kicked out of J.G.'s parent's house a few days prior and were transient. Mother had returned to her father's home to live with her children and admitted she had not bathed the children in days. Mother was 15 years old when she gave birth to B.O. and denied abusing drugs.

On March 19, 2012, CFS filed a petition on behalf of the children pursuant to section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The children were formally detained the following day at the detention hearing and placed in a foster home.

On April 18, 2012, the jurisdictional/dispositional hearing was contested by Mother, and the court referred the parties to mediation. The parties participated in mediation during which Mother agreed to submit on the allegations, with an amendment to reflect that Mother suffers from depression and not mental illness. The parties also agreed to reunification services for Mother including counseling services, parenting classes, substance abuse treatment, and random drug testing. The parties further agreed that Mother was to receive weekly two-hour visits with the children.

The contested jurisdictional/dispositional hearing was held on May 21, 2012. At that time, the court found the allegations in the petition true as amended and declared the

---

[3] A.P.'s father, J.G., had been arrested one day previously. J.G. is not a party to this appeal. B.O.'s father is also not a party to this appeal.

children dependents of the court. Mother was provided with reunification services and supervised visitation once a week for two hours.

For the November 21, 2012 six-month review hearing, CFS recommended that services continue for Mother. Mother was participating in her services; however, she had been discharged from her inpatient treatment program for having sexual relations with a male client at the facility. She had given birth to a daughter, I.P., in September 2012, and both had tested negative for methamphetamine at the child's birth. Mother and I.P. were residing in a sober living home. Mother had visited A.P. and B.O. on a weekly basis and the visits were described as appropriate. The foster mother reported that the children appeared happy to see Mother. A.P. appeared developmentally on target and was starting to talk. B.O. was participating in speech therapy and play therapy due to his behavioral issues, speech delays, and use of single words and gestures to communicate. B.O. was diagnosed with Disruptive Behavior Disorder NOS, and had daily tantrums which included hitting, throwing, and destructive behavior. The children had adjusted well to their placement and appeared to be bonded to their foster mother.

Mother's services were continued at the November 21, 2012 six-month review hearing.

On January 28, 2013, Mother left her sober living home with I.P., and failed to provide the social worker with her whereabouts. Mother had a history of abusing methamphetamine. After Mother left the sober living home on January 25, 2013, Mother failed to contact her drug court counselor, her substance abuse counselor, or the sober

4

living facility. It was believed that Mother left the sober living facility with a man named A.C. who had recently relapsed, admitted to using methamphetamine, and had an open dependency case.

On February 1, 2013, CFS filed a section 300 petition on behalf of I.P. pursuant to section 300, subdivisions (b) (failure to protect), (g) (no provisions for support), and (j) (abuse of sibling). I.P. was formally removed from Mother's custody on February 4, 2013, and a warrant of protective custody was issued for I.P.

The social worker attempted to locate Mother and I.P. for several weeks. On February 19, 2013, the social worker was informed that Mother had returned to her sober living home. Upon return to the home, Mother was drug tested and found to be positive for methamphetamine. Mother admitted to using methamphetamine for the past several weeks.

For the 12-month review hearing in B.O. and A.P.'s case in March 2013, the social worker recommended that reunification services continue for Mother. Mother was participating in her services and making moderate progress. She had visited once a week for two hours with her boys prior to leaving her sober home on January 25, 2013. The social worker was in the process of arranging visits at Mother's new sober living home. B.O. was making progress in speech therapy and his behavior was improving. A.P. was developmentally on target and displayed no emotional issues. A.P. was closely bonded to his foster mother as well as his brother B.O. I.P. had been placed in another foster home due to the unfeasibility of placing her in the same home as her brothers.

The 12-month review hearing in A.P's case and the jurisdictional/dispositional hearing in I.P.'s case was held on March 14, 2013. In A.P.'s case, the court continued services for Mother. As to I.P., the court found true the allegations in the petition concerning Mother's substance abuse, the risk to I.P. by leaving her sober home, and the open dependency. The court ordered I.P. removed from Mother's custody and ordered services for Mother.

By September 12, 2013, the social worker recommended all three children be returned to Mother's care on family maintenance, despite being aware Mother had an "uphill battle." Mother had made substantial progress on her case plan and was continuing to participate in her services. She had drug tested negative from June to August 2013, and continued to live a sober life despite facing some obstacles. She had cooperated with CFS and demonstrated an ability to take responsibility for her actions, as well as "mak[e] life changes necessary to transform herself into a stable, nurturing, and protective parent." Mother had also participated in unsupervised day visits once a week with all three children, and it was anticipated that she would begin overnight and weekend visits the week of September 2, 2013. During the visits, Mother prepared meals for the children, fed I.P., and played with the children.

At the October 17, 2013 combined 18-month review hearing for A.P. and the six-month review hearing for I.P., the court ordered the children returned to Mother's care under family maintenance services.

Unfortunately, soon thereafter, Mother relapsed. Beginning in November 2013 through March 2014, Mother was a no-show for her drug tests, which were counted as positive tests. Mother reported a relapse in January 2014, and she had stopped making progress for three months prior to April 2014. On December 30, 2013, Mother reported that she and the children were asked to leave her sober living residence because the owner believed Mother was using drugs again and was " 'back to her old habits.' " Mother moved with the children to a new home, and, during an unannounced visit, social workers found the children to be wearing dirty clothes. It also appeared their hair had not been washed for a period of days. Mother admitted to using methamphetamine two days after moving to the new residence.

On March 3, 2014, Mother brought her children into the CFS office. The social worker noted that B.O. had a severe speech impediment and was barely understandable and that I.P. was not happy to be with Mother in the room. I.P. was " 'trying the doorknob continually and crying.' " B.O. had regressed in terms of his speech delay. Mother was scheduled for an intake appointment on March 17, 2014, to reenroll in aftercare services for her substance abuse; however, Mother later noted she was aware of the meeting and knowingly missed the appointment. The social worker attempted to contact Mother at the numbers she provided, but the numbers were all disconnected.

On April 14, 2014, section 387 supplemental petitions for a more restrictive placement were filed on behalf of the children. The children were removed from Mother's care on April 10, 2014, and placed together in a foster home. Mother did not

7

understand why the children were being removed from her care. When a detention warrant was served at Mother's home, a male individual with a felony warrant was found at the home. In addition, multiple dangerous objects were observed on the ground in the residence within reach of the children, such as a BB gun and lighter. A.P. had picked up the lighter and attempted to light it without Mother taking the lighter from him. After the children were removed, they were seen by a public health nurse for assessment. The nurse noted that the children appeared and smelled dirty and they had various issues including sunburns, bruising, eczema, and scratches.

The children were formally detained at the April 15, 2014 detention hearing. Mother was provided with supervised visitation once per week for one hour.

The social worker recommended that the allegations in the supplemental petitions be found true and that no further reunification services be offered to Mother. Mother had received approximately 18 months of reunification services and six months of family maintenance services, but failed to comply with her case plan, continually failed to meet the emotional and developmental needs of the children, and continued to use illegal drugs. Mother also failed to grasp the impact her actions had on her children, and had minimized her behaviors or failed to take responsibility for her actions.

The children were initially placed together in the home of Mrs. A. The children were later removed from the home after Mrs. A. submitted a seven-day request concerning B.O.'s aggressive and assaultive behaviors. All three children were then placed together in the home of Ms. V. on April 30, 2014. B.O.'s dangerous behaviors

8

continued in Ms. V.'s home, despite B.O. receiving services. Fortunately, B.O. was able to reunite with his former foster mother where he had been placed for over one year. Since being placed with his former foster mother, he had adjusted well.

Mother had visited the children twice and acted appropriately. She told the children she loved them and offered them praise. On May 2, 2014, Mother was given an on-demand drug and alcohol test. The test results came back positive for alcohol, ethyl, and amphetamines. Mother denied drinking or using drugs. On May 6, 2014, Mother failed to test for a court-ordered on-demand drug test, claiming she had a flat tire and did not have a ride to go and test.

The contested jurisdictional/dispositional hearing on the section 387 petitions was held on June 16, 2014. The court found the allegations in the section 387 petitions true, terminated Mother's services, and set a section 366.26 hearing.

On August 27, 2014, A.P. and I.P. were removed from their foster home after the foster parent gave notice due to the children's disruptive behavior of fighting and biting each other. Mother was visiting with the children once a week for one hour and the visits were appropriate; however, by October 14, 2014, Mother had stopped attending as it was reported that she had entered " 'rehab' " and her status was unknown. Mother had failed to maintain consistent contact with the social worker and it was believed that Mother may have relapsed.

The most appropriate plan for A.P. and I.P. was adoption, and the children were in the process of being matched with prospective adoptive parents. On December 16, 2014,

9

CFS indicated that B.O.'s foster mother desired to be his legal guardian, and A.P. and I.P.'s caregiver reported wanting to adopt the children. By April 1, 2015, Mother reported she had not been visiting the children due to being out of the county and in in-patient services. The social worker believed that the most appropriate permanent plan for I.P. and A.P. was adoption in that they were both adoptable, young, healthy, and attractive children. The children had been in their adoptive home since August 28, 2014, and had made positive adjustments to the placement. They were developing emotional attachments to their prospective adoptive parent, who had continued to meet their emotional, physical, social, and medical needs. The prospective adoptive parent reported that she was willing, able, and eager to meet the children's needs on a permanent basis; that the children were like her own children; and that she loved and enjoyed her little " 'babies.' "

The contested section 366.26 hearing was held on April 8, 2015. At that time, Mother testified. Mother did not agree with the recommendation to terminate parental rights as to A.P. and I.P. and requested that the children stay with their caretaker under guardianship. She agreed with the recommendation of guardianship for B.O. She believed that the children had a close bond with her. She explained that the children called her "Mom" or " 'Mommy' "; that they were happy to see her at visits; that they would run up to her when they first saw her; and that they did not want Mother to leave. During visits, Mother would bring the children snacks, and they would color or play with toys. Mother further stated that the children asked frequently to go home with her; that

10

I.P. cried at the end of visits and would not let go; and that A.P. would state he did not want to go back and wanted to stay home with Mother.

A visitation coach testified that she had supervised Mother's visits from September 12, 2014, through February 13, 2015. She explained that during visits, Mother and I.P. were very affectionate towards one another; that I.P. made eye contact, smiled, laughed, and would initiate play with Mother; that I.P. called Mother " 'mom' "; and that I.P. liked to sit on Mother's lap or be held by Mother. She further stated that A.P. referred to Mother as "mom"; that he sought affection from Mother; that he went to Mother for hugs and kisses and would cuddle with Mother; and that he initiated play with Mother. The visitation coach also stated that she had heard the children say they wanted to go home with Mother two out of the four visits a month; that at the end of visits, the children would say they wanted to go home; and also that at the end of visits, the children sometimes cried. The visitation coach further explained that the visitation center where Mother's visits took place was a "very fun family atmosphere" and that Mother and the children took advantage of the activities, games, and arts and crafts at the center.

Following argument, the court explained that the legal preference was for adoption and that the parental bond exception did not apply. In discussing the parental bond exception, the court stated: "And for [the parental bond exception] to apply, the parent must do more than demonstrate frequent and loving contact or even demonstrate an emotional bond with the child or that the child finds the visits present [*sic*]. [¶] What should be shown is that the parent occupies a parental role with the children. And the

11

Court finds that that burden has not been satisfied here. [¶] The Court also considers that the parent must show that the parent/child relationship promotes the well-being of the child to such a degree it is to outweigh the well-being that the children in this case, [A.P.] and [I.P.], would gain in a permanent home with new adoptive parents. [¶] In other words, the Court is balancing the strengths and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging that a new family would confer." The court further explained the law pertaining to the parental bond exception, and found that "there has not been evidence that these children would be greatly harmed."

Additionally, the court commented: "The Court also notes that the mother is not asking for return or for services or anything of that nature. In fact, the mother is indicating that she simply wants them to have a legal guardianship right now. [¶] The mother is still—by way of the evidence that she has presented and from what the Court has reviewed is still grappling with her addiction issue. [¶] The Court does note that there may well be an issue with respect to March 15 to the present with respect to visits, but that does not impact the conclusion that there has not been a parental bond shown here. [¶] . . . [¶] The Court also notes that both [A.P.] and [I.P.] have spent more time out of Mother's care than in it."

In conclusion, the court found the children to be adoptable and terminated parental rights. This appeal followed.

12

II

DISCUSSION

Mother contends the juvenile court "misapplied the law" because it relied on "erroneous" factors in finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i), did not apply to preclude the termination of parental rights. She also argues that the court's finding was not supported by substantial evidence because she and the children were so strongly bonded that the children would suffer detriment if deprived of their relationship with Mother. We reject these contentions.

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)

After reunification services are terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52 (*Celine R.*).) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*Id*. at p. 53; see § 366.26, subd. (c)(1).) " 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the

13

Legislature had in mind for the dependent child.' " (*Celine R.*, *supra*, at p. 53.)  In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469 (*Scott B.*).)  The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption." (*Celine R.*, *supra*, at p. 53.)

The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances:  [¶] . . . (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  "[B]enefit," for this purpose, means that "the well-being of the child [is promoted] to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

"To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) Only in the "extraordinary case" can a parent establish the exception because the permanent plan hearing occurs after the court has repeatedly found the parent unable to meet the child's needs. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*); *Celine R.*, *supra*, 31 Cal.4th at p. 53.)

The exception requires proof of "a parental relationship," not merely a relationship that is "beneficial to some degree but does not meet the child's need for a parent." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.) The existence of a beneficial relationship is determined by the age of the child, the portion of the child's life spent in parental custody, the quality of interaction between parent and child, and the child's particular needs. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689 (*Amber M.*) [beneficial relationship exists where children in the mother's care the majority of their lives].) "Although the statute does not specify the type of relationship necessary to derail termination of parental rights, case law has required more than 'frequent and loving contact.' " (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424.) Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

"[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "Day-to-day contact is not necessarily required, although it is

15

typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Ibid.*)

A parent claiming the applicability of the beneficial parental exception has the burden of proof. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*); *In re C.B.* (2010) 190 Cal.App.4th 102, 133-134; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.) The parent must show both that a beneficial parental relationship exists *and* that severing that relationship would result in great harm to the child. (*Bailey J.*, *supra*, at pp. 1314-1315.)

We apply the substantial evidence standard of review to factual issues, such as the existence of a beneficial parental relationship, and the abuse of discretion standard to the discretionary determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531; *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The standard of review analysis is essentially the same under both standards. As one court explained: " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that . . . no judge could reasonably have made the order that he did.'. . ." ' [Citations.]" (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

Mother argues that the juvenile court misapplied the law when it based its decision in part on its conclusion that Mother had not asked for return of the children. She contends that the statute does not state the exception does not apply if a parent has not asked for return of his or her child or reinstatement of reunification services. We reject this claim. Mother's contention belies the record, and she improperly emphasizes on one comment made by the juvenile court, which was made *after* the court had rendered its decision that the exception did not apply. The record shows the court clearly articulated the relevant legal standard applicable to the beneficial parental relationship exception and correctly applied the law.

Mother further contends that the beneficial parental relationship exception applied in this case and the juvenile court's conclusion to the contrary is not supported by substantial evidence. However, since it is the parent who bears the burden of producing evidence of the existence of a beneficial parental relationship, it is not enough that the evidence supported such a finding; the question on appeal is whether the evidence compels such a finding as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) As the court in *In re I.W.* discussed, the substantial evidence rule is "typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." (*Ibid.*) When, however, the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization

17

is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the [Mother's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such character and weight as to leave no room for a judicial determination that it was insufficient to support a finding [in Father's favor].' [Citation.]" (*Ibid.*) Accordingly, unless the undisputed facts established the existence of a beneficial relationship as a matter of law, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Here, essentially there was no dispute that Mother had maintained regular visits and contact with the children within the confines of her circumstances. However, Mother cannot show the existence of her relationship with the children is sufficient to outweigh the children's need for a stable and permanent home. Although there was evidence that A.P. and I.P. understood that Mother was their mother, and that they enjoyed visits with their mother, there is no denying the fact that after being dependent children of the court for most of their young lives, A.P. and I.P. required stability and permanency. A.P. had been in the dependency system since he was nine months old and I.P. since she was four months old. A.P. had lived outside of Mother's care in a foster home until he was two

18

and a half months old, and I.P. until she was almost 13 months old. The children were returned to Mother's care in October 2013, yet almost six months later were again removed from Mother's care after she relapsed. At the time of the section 366.26 hearing, A.P. was almost four years old, and I.P. was two and a half years old. At most, Mother had cared for A.P. for merely 15 months of his young life, and I.P. for about 10 months of her young life.

We can also assume for purposes of our analysis that Mother and the children had a beneficial parent-child relationship. Mother, however, cannot establish that the children " 'would be greatly harmed' " by terminating her parental rights. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.) There is nothing in the record to suggest that A.P. and/or I.P. would suffer great harm as a result of proceeding with adoption and terminating parental rights. Indeed, there is ample support for the contrary conclusion. By the time of the section 366.26 hearing, the children had been in their prospective adoptive home for almost eight months, after having been moved approximately four times. It was also reported that the children had made a positive adjustment to their prospective adoptive mother, and were developing an emotional attachment to her. The prospective adoptive parent was committed to providing the children with stability and continued to meet the children's physical, emotional, social, and medical needs. The prospective adoptive mother stated that A.P. and I.P. were like her own children and she loved them. After years of turmoil due to Mother's substance abuse and inability to properly care for the children, the children were placed in a loving supportive home that provided them with

stability. There is no evidence that the children would suffer any detriment as a result of terminating parental rights. Consequently, the juvenile court could reasonably conclude that termination of Mother's parental rights would have no detrimental impact on the children.

Mother's reliance on *Scott B.*, *supra*, 188 Cal.App.4th 452 is unavailing as that case is clearly distinguishable from the present matter. In *Scott B.*, *supra*, 188 Cal.App.4th 452, the child's court-appointed special advocate stated repeatedly in her reports that Scott and his mother had a very close relationship and it would be detrimental to Scott for the relationship to be disrupted. Scott had insisted repeatedly that he would prefer to live with his mother, was strongly bonded to her, and believed that adoption meant his mother would be included in his adoptive family. (*Id*. at p. 471.) Moreover, he was emotionally unstable and had threatened to run away if he was adopted because he wanted to live with his mother. (*Id*. at pp. 466, 471.) His "regressive" behavior had stabilized with "wraparound services and the support of Mother." (*Id*. at pp. 465, 472.) On those facts, the Court of Appeal concluded the juvenile court should have applied the beneficial relationship exception to termination of parental rights. (*Id*. at p. 472.) Obviously, the circumstances of the present case are vastly different.

For similar reasons, another case on which Mother relies, *Amber M*., *supra*, 103 Cal.App.4th 681, is also distinguishable. In that case, a psychologist who conducted a bonding study of the mother and the oldest child, who was seven years old, concluded that they had a primary attachment and a primary maternal relationship, which it would

be detrimental to the child to sever.  (*Id*. at p. 689.)  The oldest child's therapist also believed it was important to continue her relationship with the mother.  (*Ibid*.)  There was also evidence of a strong attachment to the mother on the part of the two younger children.  (*Id*. at pp. 689-690.)  The presence of this "common theme running through the evidence" that there was "a beneficial parental relationship that clearly outweigh[ed] the benefit of adoption" prompted the appellate court to rule that the beneficial relationship exception applied, and to reverse the juvenile court's order terminating mother's parental rights.  (*Id*. at p. 690.)  No comparable evidence was introduced in the present case.

Here, there is some evidence to show that the children enjoyed their visits and contacts with Mother.  "But this is simply not enough to outweigh the sense of security and belonging an adoptive home would provide."  (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81 (*Helen W.*))  In *Helen W.*, the appellate court held that the beneficial parental relationship exception did not apply, although the children referred to the mother as "Mom," the mother and the children loved each other, and the mother provided for the children's needs during visits.  (*Id*. at p. 81; accord, *In re Cliffton B., supra*, 81 Cal.App.4th at pp. 424-425.)  In this case, the benefit the children will receive from a stable home with a caregiver, with whom they already have a positive relationship and who meets their needs, outweighs the benefit the children might receive from maintaining a relationship with Mother.

For the foregoing reasons, and based on our review of the entire record, we conclude the juvenile court properly determined that the beneficial parental relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i), did not apply.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

MILLER

J.

CODRINGTON

J.